PHIL TOLKAN DATSUN, INC.,
Plaintiff-Appellant,

v.

The GREATER MILWAUKEE DATSUN DEALERS' ADVERTISING ASSOCIATION, INC., et al., Defendants-Appellees.

No. 81–1403.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1981.
Decided March 2, 1982.

Robert B. Corris, Charne, Glassner, Tehan, Clancy & Taitelman, S. C., Milwaukee, Wis., for plaintiff-appellant.

Scott W. Hansen, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S. C., Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and CAMPBELL,* Senior District Judge.

CUDAHY, Circuit Judge.

In this private antitrust action, plaintiff-appellant Phil Tolkan Datsun ("Tolkan" or "Tolkan Datsun") appeals from a grant of summary judgment in favor of defendants Greater Milwaukee Datsun Dealers' Association (the "Association") and its individual members and directors. Because we agree that the undisputed facts demonstrate the absence of federal antitrust liability, we affirm the judgment of the district court.

## I.

The Nissan Motor Corporation ("Nissan") distributes its Japanese-made automobiles and trucks in the United States under the name "Datsun". In 1976, Nissan began encouraging Datsun dealers in this country to form advertising associations. Nissan offered to add $40 to the invoice of each car or truck sold to each dealer in an area, and to distribute this money to the local association for joint advertising purposes. In addition to the benefits of joint advertising, association members were to be allowed extra allotments of cars for special Datsun promotions.

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

Defendants AFL Motors, Inc., Zimdars Motors, Inc. and Waukesha Datsun, Inc. are all Datsun dealers located in and around Milwaukee, Wisconsin. On August 2, 1978, AFL Motors, Zimdars Motors and Waukesha Datsun formed the Greater Milwaukee Datsun Dealers' Association, also a defendant here. On that day the Association adopted corporate by-laws which included a requirement that existing members unanimously approve the admission of any new member.

On January 17, 1979, Nissan sent a letter to all car dealers in the four-county Milwaukee area, "actively soliciting candidates with automobile background and necessary capital" to establish an additional Datsun dealership in the North Milwaukee area. AFL and Zimdars objected to this solicitation because they believed Nissan was not supplying them with enough new cars to meet existing customer demand. AFL Motors was also upset about Nissan's search for an additional dealer because in mid-1978 AFL had moved several miles north from its central city location to provide Nissan with the "North Milwaukee" dealership Nissan was now soliciting.

On March 21, 1979, Nissan sent its Milwaukee dealers a letter stating that a new Datsun dealership would be located at 7676 North 76th Street, Milwaukee, the address of Phil Tolkan Pontiac, Inc. On March 28, 1979, AFL Motors and Zimdars Motors wrote to Nissan, formally objecting to the new dealership. On April 17, 1979, AFL and Zimdars filed an action in state court seeking to enjoin Nissan from appointing a new Milwaukee-area dealer. On May 1, 1979, Tolkan Datsun was formally appointed a Datsun dealer, and on May 7, Tolkan's state dealership license issued. Upon the application of AFL and Zimdars, the state court issued an ex parte temporary restraining order on May 7, 1979, prohibiting Nissan from establishing a Datsun dealership at 7676 North 76th Street. After a hearing on May 14, 1979, the temporary restraining order was dissolved.

Sometime in May 1979, Nissan presented to Tolkan Datsun, and the dealership signed, an application for membership in the defendant Association. Apparently, this application was never forwarded to the Association itself. Nevertheless, the subject of Tolkan's possible membership was discussed at an Association meeting on May 25, 1979. According to minutes taken at that meeting, Phil Tolkan was to be called and asked to apply for membership so that the Association could consider his application.[1]

In the meantime, the Association had been planning a special Datsun promotion. On March 21, 1979, the Association discussed the submission of a proposal involving the sale of Datsun 210s, the lowest-priced Nissan car. On March 22, 1979, the vice president of AFL Motors, the president of Zimdars Motors, and the secretary of Waukesha Datsun sent identically-worded letters to Nissan's regional sales manager, Robert Bower, each requesting 100 Datsun Model 210 hatchbacks for the special promotion. Kenneth Ausman, the president of the Association, also sent a letter in his official capacity asking for the 300 cars. On April 19, 1979, Bower wrote to Ausman as Association president to inform him that the request "for 300 additional 210 models for your scheduled advertising promotion has been approved." Bower indicated that production of the cars was scheduled for mid-May, with delivery to take place in mid-to-late June. On May 22, 1979, Bower wrote to Ausman, again as Association president, to advise of receipt of a "preliminary notice of shipment of the vehicles for your Association's promotion."

The Association's first advertising appeared in the Sunday, June 10, 1979, *Milwaukee Journal.* Because Tolkan Datsun was not among the dealers listed, Thomas Weil, president of Tolkan, called Bower to complain. On June 11, 1979, Bower wrote to Ausman as Association president informing Ausman that Tolkan had signed an application supplied by Nissan for membership in the Association. On June 14, 1979, Ausman answered by letter, stating that

1. *See* Appellant's Appendix at 54, Minutes of Meeting on May 25, 1979.

[A]lthough Phil Tolkan requested information concerning membership in our Advertising Association, we have not yet received a formal application as called for by our by-laws. As a courtesy to Phil Tolkan, we have, by letter of even date, forwarded to them our application should they be interested.

Shortly thereafter, Tolkan substantially completed and returned the Association's application, along with a letter objecting to some of the questions on the form.

At an Association meeting on July 9, 1979, AFL, Zimdars, and Waukesha Datsun discussed Tolkan Datsun's application for membership in the Association. The members decided that Tolkan's admission would not be considered until September 1, 1979, or until the end of the 210 promotion, whichever occurred first. In a letter dated July 20, 1979, Ausman as Association president informed Tolkan president Weil of the Association's decision. Tolkan Datsun did not object to this decision.

During this time, the state court action by AFL and Zimdars against Nissan remained pending.[2] AFL Motors was opposed to admitting Tolkan Datsun to the Association until the action was resolved because it felt that doing so might contradict its legal position that Nissan should not have appointed a new Milwaukee area dealer. AFL re-emphasized this concern on September 10, 1979, when the Association again met to consider Tolkan Datsun's admission. The other two Association members took the position that Tolkan Datsun should be admitted or the Association dissolved. Unable to reach agreement, the members decided to deactivate the Association. On September 11, 1979, Ausman, as Association president, informed Tolkan that

[B]y vote of the membership, your Application for Membership is being held in ab[e]yance, pending the outcome of litigation between several of the Members and Nissan.

On September 28, 1979, Tolkan Datsun filed suit in federal court against the Association, its members and officers, claiming violations of both state and federal antitrust laws. Tolkan alleged that the Association's refusal to admit Tolkan as a member constituted a group boycott and was thus *per se* illegal under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1976). Tolkan also contended that the same legal principles entitled it to damages at least equal to the profits on 60 Datsun Model 210s—such profits representing the difference between the money Tolkan would have made from an 80-vehicle pro rata share of 320 promotional hatchbacks (the 300 cars ordered by the Association plus 20 additional vehicles that would have been made available by Nissan's Chicago office) and the profit Tolkan actually garnered from the 20 extra cars provided to him during the promotion period.

On April 22, 1980, Tolkan filed a motion for partial summary judgment on its federal antitrust claims. The Association filed a cross motion for summary judgment, arguing *inter alia*, that its temporary refusal to admit Tolkan as a member did not constitute a *per se* antitrust violation, that Tolkan Datsun was not entitled to participate in the special 210 promotion and that, absent such an entitlement, Tolkan had suffered no competitive injury as a result of the Association's actions or the operation of its by-laws.[3] On February 12, 1981, the district court granted the Association's motion for summary judgment and dismissed Tolkan's complaint. The district court held that the Association's conduct was not *per se* illegal, and that under the rule of reason, Tolkan had failed to allege sufficient anticompetitive injury to establish a violation of § 1 of the Sherman Act. On appeal, Tolkan challenges both of these conclusions.

---

2. The state court action was settled and dismissed on June 4, 1980.

3. The Association also argued that the district court lacked subject matter jurisdiction because Tolkan had failed to show that the Association's conduct affected interstate or foreign commerce, and that Tolkan's claims were barred because it had failed to demand a share of the Datsun 210 hatchbacks from the Association at the time of the promotion. The district court did not address these arguments.

## II.

■ As this court recently re-emphasized, the rule of reason is the standard traditionally applied to most anticompetitive practices challenged under § 1 of the Sherman Act. *United States Trotting Association v. Chicago Downs Association*, 665 F.2d 781, 787 (7th Cir. 1981) (en banc). There are, however, a limited number of practices "which, because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal" without the often elaborate inquiry into anticompetitive effect which is characteristic of rule of reason analysis. *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Only after courts have had considerable experience with a particular type of conduct, and application of the rule of reason has inevitably resulted in a finding of anticompetitive effect, will the practice in question generally be deemed a *per se* violation. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir. 1980); *see Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

The Supreme Court has long characterized certain types of group boycotts as *per se* antitrust violations. For example, in *Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n.*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), the Court held that the refusal of an organization of dress manufacturers and designers to do business with any retailer or manufacturer who sold copies of their original designs constituted a *per se* violation of the Sherman Act. Similarly, in *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the Court condemned as a *per se* offense an agreement among a department store chain and as many as ten national manufacturers of household appliances to refuse to sell (or to sell only on highly unfavorable terms) to a retail outlet competing with the department store chain. Central to the Court's holdings in both *Fashion Originators' Guild* and *Klor's* was its perception that the behavior in question represented a "naked restraint[ ] of trade with no purpose except stifling of competition." *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); *see E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 179 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); L. A. Sullivan, ANTITRUST 242 (1977). As the District of Columbia Circuit explained in *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C.Cir.1978):

> The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, the hallmark of the "group boycott" is the effort of competitors to "barricade themselves from competition at their own level." It is this purpose to exclude competition that has characterized the Supreme Court's decisions invoking the group boycott *per se* rule.

593 F.2d at 1178 (footnote omitted).[4]

In its more recent antitrust decisions, the Supreme Court has cautioned against overzealous application of the *per se* doctrine. Thus, in *Broadcast Music Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Court

---

4. The *Smith* court also noted that the third type of group boycott to which it referred—the refusal to deal by traders at the same level as the would-be competitor—is "relatively rare" and "can be effective only where it is necessary for firms at the boycotting level to do business with each other, as is true, for example, in the case of brokers." 593 F.2d at 1178 n.16. It is this third type of boycott which is at issue in the instant case.

indicated that *per se* treatment was justified only where the purpose and effect of the challenged practice "are to threaten the proper operation of our predominantly free-market economy," or where the "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." 441 U.S. at 19–20, 99 S.Ct. at 1562. Similarly, in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Court stated that "*per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." In addition, both this and other courts of appeals have pointed out the pitfalls of sweeping too broadly with the characterization, "group boycott":

> The term "group boycott" . . . is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "per se" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.

*Mackey v. National Football League*, 543 F.2d 606, 619 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), quoting *Worthen Bank & Trust Co. v. National BankAmericard, Inc.*, 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied*, 415 U.S. 818, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). *See United States Trotting Association v. Chicago Downs Association, Inc.*, 665 F.2d 781, 788 (7th Cir. 1981) (en banc) ("The danger of rote application of the *per se* rule to all conduct that can be called a 'group boycott' is that the sound teachings of experience will be extended into new and unfamiliar areas, where they have no proper application."); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1365–69 (5th Cir. 1980) (even though real estate association's membership rules "literally [ ] constitute a group boycott," they do not fit within the *per se* rationale and must therefore be ana-

lyzed under the rule of reason); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 187 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973) (in the context of concerted refusals to deal "resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a 'naked restraint of trade.' ").

Because they often depart from the traditional group boycott paradigm, membership arrangements in trade associations form an exception to the general rule that group boycotts constitute *per se* antitrust violations. *See Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Ass'n*, 371 F.2d 263, 268–69 (7th Cir. 1967), *cert. denied*, 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627 (1973); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178–81 (D.C.Cir.1978). Tolkan Datsun concedes the existence of such an exception but argues that *per se* treatment is still appropriate here since both the purpose and the effect of the challenged membership restriction was to "exclude competitors or coerce conduct." *See* District Court Opinion at 6, Appellant's Brief at 13. In support of this argument, Tolkan relies heavily on *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), in which the Supreme Court found that certain membership requirements of the Associated Press constituted an unreasonable restraint of trade. Tolkan also cites *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), in which the Court held unlawful the denial by the New York Stock Exchange of direct-wire telephone connections to a nonmember stock broker. An examination of these cases, however, reveals that neither serves to support plaintiff's position here.[5]

In *Associated Press*, the Supreme Court struck down, under an abbreviated rule of reason analysis, those portions of the Asso-

---

**5.** Although the Supreme Court opinions in *Associated Press* and *Silver* used different analytical frameworks (*Associated Press* was ostensibly a rule of reason case while *Silver* invoked a variant of *per se* analysis), we believe that the Supreme Court considered and relied upon similar economic factors in reaching both decisions. It is the absence of these factors which, we believe, clearly distinguishes *Associated Press* and *Silver* from the instant case.

ciated Press by-laws that prohibited all Associated Press members from selling news to non-members and which granted to each member the power to prevent its non-member competitors from joining the association. In holding the restrictions unreasonable, the Court relied heavily on the findings of a three-judge district court that Associated Press "was the chief single source of news for the American Press, universally agreed to be of great consequence," and that "[i]t is practically impossible for any one newspaper alone to establish or maintain the organization requisite for collecting all of the news of the world, or any substantial part thereof." 326 U.S. at 11 n.7, 13 n.10, 65 S.Ct. at 1420 n.7, 1421 n.10 (quoting district court opinion). The Supreme Court also emphasized that

> [i]nability to buy news from the largest news agency, or any one of its multitude of members, can have most serious effects on the publication of competitive newspapers, both those presently published and those which, but for these restrictions, might be published in the future.

326 U.S. at 13, 65 S.Ct. at 1421 (footnote omitted).

More recently, in *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Supreme Court held that "absent any justification derived from the policy of another statute or otherwise," an agreement among stock exchange members to exclude non-members from access to essential stock market information would constitute a *per se* antitrust violation. In explaining its reference to *per se* illegality, the *Silver* Court noted that "[i]nstantaneous communication with firms in the mainstream of the securities business is of great significance to a broker-dealer not a member of the Exchange," 373 U.S.

at 343, 83 S.Ct. at 1249, and stated that the concerted action of the Exchange and its members had "depriv[ed] petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market." 373 U.S. at 347, 83 S.Ct. at 1251.

■ Taken together, *Silver* and *Associated Press* suggest that, where the "group boycott" under challenge does not involve a direct effort to influence the supply of, or demand for, a competitor's product, *per se* treatment may not be appropriate. Thus, where, as here, the alleged "boycott" merely entails the refusal by a group of competitors to deal with another trader on their own level of distribution, considerations of industry structure and anticompetitive potential remain paramount. *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1366–67 (5th Cir. 1980). In the instant case, plaintiff has made no showing that membership in the defendant Association is necessary (or even desirable) to compete effectively as a Datsun dealer.[6] Unlike the plaintiffs in *Associated Press* and *Silver*, Tolkan Datsun was not deprived of a substantial business relationship by virtue of the Association's conduct, nor was its competitive position significantly impaired. Indeed, the only concrete injury alleged by Tolkan was its inability to share in the profits of the previously planned Datsun 210 special promotion.[7] Such an absence of anticompetitive effect is not surprising given the Association's lack of market power and its relative inability to influence either the supply of, or the demand for, Datsun automobiles. As the Fifth Circuit recently noted in rejecting *per se* treatment of a real estate association's membership restrictions,

> [i]f an association lacks market power, it is of course unlikely that serious anti-

---

**6.** Indeed, although the ability to obtain extra cars for special promotions was cited as a prime motive for forming the Association, the record indicates that Datsun was willing to supply promotional vehicles to any Datsun dealer who requested them, regardless of membership in an advertising association. *See* Dep. of Robert Bower, Nissan Regional Sales Manager, at 66. Plaintiff in the instant case received 20 additional 210 hatchbacks from Nissan in

lieu of participation in the ongoing Association promotion. *See* Appellant's Brief at 11.

**7.** Because we have found that Tolkan had no clear right to participate in this promotion, we do not regard this alleged injury as sufficient to justify *per se* treatment or, for that matter, to impose Sherman Act liability. *See* Part III *infra*.

competitive effects will result from exclusions from membership.

*United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1372 n.40 (5th Cir. 1980).

Like the Fifth Circuit, therefore, we decline to accept plaintiff's apparent contention that any denial of membership by an ongoing trade association constitutes a *per se* violation of § 1 of the Sherman Act, regardless of its lack of anticompetitive effect. Rather, we believe that the goals of antitrust law, as well as the relevant Supreme Court and circuit precedents indicate that membership restrictions by trade organizations not possessed of significant economic or operational leverage are more appropriately evaluated according to the standards of the rule of reason.

### III.

■ Under the rule of reason, a showing of anticompetitive effect in the relevant market is an essential predicate of antitrust liability. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). As this court recently stated in *Lektro-Vend Corporation v. The Vendo Co.*, 660 F.2d 255 (7th Cir. 1981):

> It is by now well established that any rule of reason analysis requires a showing of anticompetitive market effect. To hold otherwise would ignore the very purpose of the antitrust laws which were enacted for the protection of competition, not competitors.

660 F.2d at 268. *See also Contractor Utility Sales Co. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1078 (7th Cir. 1981).

■ Plaintiff in the instant case relies primarily on its loss of profits from the special Datsun 210 promotion as evidence of such an anticompetitive effect. We agree with the district court, however, that Tolkan Datsun had no clear right to participate in this promotion and, thus, that Tolkan's failure to share in its profits cannot constitute the requisite competitive harm for a rule of reason violation. Preparations for the Datsun promotion began in March 1979, more than six weeks before Tolkan became a licensed Datsun dealer and nearly three months before defendant dealers were formally advised of Tolkan's interest in joining the Association.[8] Moreover, it appears that Tolkan accepted its Datsun dealership knowing that it had no right to obtain any of the 210 hatchbacks previously purchased by the defendant dealers. In a June 11, 1979, letter to Association President Kenneth Ausman, Nissan's regional manager Robert Bowers stated:

> At the time this promotion was scheduled, Phil Tolkan Datsun, Inc. had not yet become a dealer, therefore we do not have 100 210's available for them [sic] to be able to participate on the same basis as the rest of you. This has been discussed with [Tolkan Datsun President] Mr. Weil and he is aware his availability during the time of your promotion will be limited.[9]

Tolkan attempts to establish his entitlement to a pro rata share of the promotional 210 hatchbacks by arguing that, as of May 1979, "none of the Association's members would have been in any way prejudiced by offering Tolkan Datsun a one quarter share of the 300 promotional vehicles." Plaintiff's Brief at 19. However, the mere fact that Association members would have suffered no financial detriment by sharing their cars with Tolkan, in no way obligated them to do so. Moreover, even if the absence of prejudice could somehow create a duty to share, plaintiff's argument ignores the fact that defendant dealers had risked substantial capital in ordering the extra cars in March 1979, while plaintiff, who entered the market two months later, had

---

**8.** It is undisputed that defendant dealers each ordered their 100 promotional cars on March 22, 1979. These orders were approved by Nissan on April 19, 1979. Tolkan first became a licensed Datsun dealer on May 7, 1979.

**9.** *See also* Dep. of Phil Tolkan at 59, line 13. Nor, apparently, did Tolkan Datsun object when it was informed by the Association, in July 1979, that its membership application would not be considered until after completion of the 210 promotion. *See* Letter dated July 20, 1979, from Association President Kenneth Ausman, to Tolkan President Thomas Weil. *See also* Affidavit of Larry Hanke, Secretary-Treasurer of Waukesha Datsun, ¶ 2, Appellee's Appendix at 14.

risked nothing. The record indicates that as of March 1979, demand for the Datsun 210 hatchback was relatively low, and Datsun's manufacturing facilities were not operating at full capacity. By the time Tolkan became a Datsun dealer in early May, however, a severe gasoline shortage had caused demand for Datsuns to rise sharply, thus virtually guaranteeing that the dealers' investments would be profitable. *See* Dep. of Robert Bowers, Nissan Regional Sales Manager, at 66–68. Under these circumstances, to require defendants to share the profits of what turned out to be a shrewd investment with a competitor who had risked no capital and who had entered the market after the cars in question were selling like "hot cakes," would violate the principle of rewarding entrepreneurial risk-taking, a capitalist commonplace presumably endorsed by the Sherman Act.[10]

## IV.

Even if Tolkan Datsun were arguably entitled to participate in the 210 promotion, however, we are dubious that its exclusion from such a limited one-shot transaction would be sufficient to establish antitrust liability under the rule of reason. *See Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 558 (7th Cir. 1980). *Cf. Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 333, 81 S.Ct. 623, 631, 5 L.Ed.2d 580 (1961) (single requirement contract violated § 3 of Clayton Act only where it is likely to substantially lessen competition in the relevant competitive market). As the district court in this case noted, defendants' failure to reallocate the promotional vehicles after Tolkan became a licensed Datsun dealer did not derogate from Tolkan's ability to sell the cars already allocated to it by Nissan. Nor was Tolkan's continued economic via-

bility threatened by the challenged membership decision. Certainly, this court cannot condone the arbitrary exclusion of a competitor from an ongoing trade association; nor do we foreclose the possibility that Tolkan Datsun may have a valid state cause of action against the Association or its members for unfair competition or some other business tort. Rather, we merely hold that plaintiff's allegations in the instant case, even fortified by all reasonable inferences that can be drawn from them, do not establish the sort of anticompetitive injury that the antitrust laws are designed to remedy. As this court recently stated:

> It is not the unfair means which may have been employed by the defendant that fall within the purview of the Sherman Act. Rather, the sole question is whether those means lessened competition. As noted above, unfair competition is still competition, and will be actionable under the antitrust laws generally only where a defendant with substantial market power uses the unfair means to increase its share of the market by eliminating a competitor, thereby creating the risk of a monopoly.

*Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 558 (7th Cir. 1980).

Aside from its inability to share in the Datsun 210 promotion profits, Tolkan has pointed to no significant competitive injury flowing from its temporary denial of Association membership.[11] Although Tolkan takes issue with the district court's conclusion that the Association was voluntarily deactivated in September 1979, oral argument established that Tolkan is now a fully functioning member of the defendant Association and has participated in all promotions undertaken since the filing of this lawsuit. Thus, although Tolkan invites us

---

**10.** For a discussion of related "free rider" problems in other areas of antitrust law, *see* Posner, The Rule of Reason and the Economic Approach: Reflections on the *Sylvania* Decision, 45 U.Chi.L.Rev. 1, 6–10 (1977). *Cf.* Matthew 20:1–20:16 (Parable of the Laborers in the Vineyard).

**11.** Plaintiff argues in its briefs that it was also injured by being excluded from the Association's joint advertising campaign. This argument, however, is circular, in that the only

advertising undertaken by the Association during the relevant time period related to the special 210 promotion. Because Tolkan had no legal right to participate in this promotion, it could not have suffered a legally cognizable harm by being denied the benefit of such advertising. Nor is there any realistic possibility that Tolkan will be denied the benefit of any future Association advertising since it was conceded at oral argument that Tolkan is now a

to speculate on whether its permanent exclusion from an ongoing trade association would constitute an antitrust violation, or whether an association could use repeated voluntary deactivation to circumvent the requirements of the antitrust laws, we believe it would be inappropriate to do so on the facts of this case.[12] "[T]he absence of a sufficient allegation of anticompetitive effects in a Sherman Act complaint is fatal to the existence of the cause of action." *Havoco, supra* at 554. Because plaintiff has failed to identify any clear or significant anticompetitive effects, and because the pleadings, depositions, affidavits and admissions on record demonstrate the lack of any genuine issues of material fact *relevant to plaintiff's federal antitrust claim*, we affirm the district court's grant of summary judgment in favor of defendant Association and its individual members and officers.

AFFIRMED.

fully functioning member of the Association. *See* note 12 *infra.*

12. We do not dispute Tolkan's contention that where an antitrust violation has been demonstrated, a court may properly consider possible future effects of that violation for purposes of fashioning monetary or injunctive relief. *See, e.g., United States v. W. T. Grant Co.*, 345 U.S. 629, 633–35, 73 S.Ct. 894, 897–898, 97 L.Ed. 1303 (1953). In the instant case, however, plaintiff has failed to establish the existence of any present antitrust violation.