**R. Anthony MARRESE, M.D. and Michael R. Treister, M.D., Plaintiffs-Appellees,**

v.

**AMERICAN ACADEMY OF ORTHO- PAEDIC SURGEONS, Defendant-Appellant.**

No. 81–2671.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1982.

Decided May 11, 1983.

Rehearing En Banc Granted and Opinion Vacated July 19, 1983.

---

Stewart, Retired Justice, filed a dissenting opinion.

D. Kendall Griffith, Hinshaw, Culbertson, Moelman, Hoban & Fuller, Chicago, Ill., for defendant-appellant.

Michael T. Sawyier, Foss, Schuman & Drake, John J. Casey, Chicago, Ill., for plaintiffs-appellees.

Before PELL, Circuit Judge, STEWART, Justice (Retired), and POSNER, Circuit Judge.*

* Judge Sprecher was originally the third member of the panel, but his untimely death prevented his participation in the decision of this case.

Judge Posner took his place and read the briefs and pertinent portions of the record and lis-

POSNER, Circuit Judge.

This is an appeal from a judgment for criminal contempt for disobeying a discovery order. The appeal was originally decided by this panel in an opinion published at 692 F.2d 1083 (7th Cir.1982), with Justice Stewart dissenting, id. at 1096. Rehearing en banc was granted, but shortly before argument was scheduled to be heard it became apparent that the reservations of the judges who had voted to rehear the case concerned the breadth of the panel's majority opinion, and that if the panel majority was willing (as it was) to write a more narrowly focused opinion, en banc consideration could be obviated. This is that opinion. It has been circulated to all the members of the court in regular active service so that the court could decide, not whether it wants to adopt this opinion as the opinion of the court en banc, but whether it wants to go ahead with the scheduled en banc rehearing of the prior opinion; and the court by majority vote has decided to vacate the order granting rehearing en banc.

The American Academy of Orthopaedic Surgeons is a private association to which most orthopaedic surgeons in the United States belong. The plaintiffs, two orthopaedic surgeons practicing in Evansville, Indiana, and Chicago, respectively, were denied membership in the Academy without a hearing or a statement of reasons. Although membership in the Academy is alleged to confer certain professional advantages, it is not a prerequisite either to being certified to practice as an orthopaedic surgeon or to obtaining hospital staff privileges; each of the plaintiffs is certified to practice orthopaedic surgery, and has staff privileges at several hospitals.

The plaintiffs first sued the Academy in an Illinois state court, claiming a right under Illinois law to a hearing on their application and to reasonable standards for membership. They lost; the Illinois Appellate Court held that the complaint failed to state a claim because membership in the Academy is not an "economic necessity." Treister v. American Academy of Ortho-

paedic Surgeons, 78 Ill.App.3d 746, 755–56, 33 Ill.Dec. 501, 508, 396 N.E.2d 1225, 1232 (1979). They then sued the Academy in federal district court, seeking injunctive relief and damages under section 1 of the Sherman Act, 15 U.S.C. § 1. The complaint alleged that the Academy is "a monopoly in its field, possessed of substantial power to control the market for orthopaedic surgical services," and that the plaintiffs, though fully qualified for membership under the announced criteria of the Academy, were denied membership for "extraneous" reasons, which in the case of Dr. Treister (no particulars were given for Dr. Marrese) included "(a) his supposed willingness to offer expert testimony against other orthopaedic surgeons in medical malpractice cases; (b) his known willingness to consult surgical out-patients on a relatively high-volume basis; and (c) his nonconformity of personality and personal attitudes with those of most established orthopaedic surgeons and · in particular those who were already members of the academy." The complaint alleged that the effect of denying the plaintiffs' applications for membership had been "to limit competition and enforce conformity with current business practices" and to injure the plaintiffs in the practice of their profession.

Discovery began. The plaintiffs asked the Academy to produce all of its correspondence and other documents relating to the denial of the plaintiffs' applications for membership and to all other denials of membership applications between 1970 and 1980. The Academy refused, even after the court ordered it to produce the requested documents. The court held the Academy in criminal contempt and fined it $10,000, and this appeal followed.

 The Academy asks us to hold that the discovery order was improper, but the plaintiffs point out that it is not a final order and argue that we cannot review it because the district court has not certified it for an immediate appeal under 28 U.S.C. § 1292(b). The contempt judgment, how-

---

tened to the tape recording of the oral argu- ment.

ever, is a final order, reviewable by us; and if a party is willing to pay the price of being punished for contempt or suffering an equivalent sanction such as dismissal of the complaint if the validity of the order he has disobeyed is ultimately upheld, he may get immediate review of that order by appealing from the contempt judgment. E.g., *United States v. Ryan,* 402 U.S. 530, 532–33, 91 S.Ct. 1580, 1581–1582, 29 L.Ed.2d 85 (1971); *Ryan v. Commissioner of Internal Revenue,* 517 F.2d 13, 19–20 (7th Cir.1975); *Hanley v. McHugh Constr. Co.,* 419 F.2d 955, 957 (7th Cir.1969); *National Util. Serv., Inc. v. Northwestern Steel & Wire Serv., Inc.,* 426 F.2d 222 (7th Cir.1970); *Hastings v. North East Independent School Dist.,* 615 F.2d 628, 631 (5th Cir.1980).

True, some cases hold, in apparent contradiction to the above, that where as in this case the judgment is for criminal rather than civil contempt the validity of the underlying order may not be questioned on appeal from the contempt judgment. E.g., *United States v. United Mine Workers of America,* 330 U.S. 258, 291–94, 67 S.Ct. 677, 694–696, 91 L.Ed. 884 (1947); *ITT Community Development Corp. v. Barton,* 569 F.2d 1351, 1356 (5th Cir.1978). Yet our decision in *Hanley,* for example, involved criminal contempt; and the two lines of cases can be reconciled, see *Hanley v. McHugh Constr. Co., supra,* 419 F.2d at 957; *United States v. Ryan, supra,* 402 U.S. at 532 n. 4, 91 S.Ct. at 1582 n. 4; 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3537, at pp. 340–41 (1975), by noting that in the cases where the validity of the underlying order was held not to be reviewable on appeal from the judgment of contempt the order could have been appealed as of right directly, which discovery orders cannot be. The right to have a discovery order reviewed on appeal from a contempt judgment thus serves as a safety valve in the final-judgment rule of 28 U.S.C. § 1291. Such an order may impose heavy and irrecoverable costs on a party; yet to make discovery orders appealable as of right would lead to unacceptable delays in federal litigation. Confining the right to get appellate review of discovery orders to cases

where the party against whom the order was directed cared enough to incur a sanction for contempt is a crude but serviceable method of identifying the most burdensome discovery orders and waiving the finality rule only for them.

The validity of the discovery order that the Academy disobeyed is therefore properly before us. Rule 26(c) of the Federal Rules of Civil Procedure empowers the district court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... that discovery not be had ...," and Rule 26(d) empowers the court, "upon motion, for the convenience of parties and witnesses and in the interests of justice," to control by order the sequence and timing of discovery. Although the effective management of complex litigation requires that the district judge be allowed broad discretion in guiding the discovery process and therefore in exercising his powers under Rules 26(c) and (d), *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1240 (6th Cir.1981), his discretion is not unlimited, and if we have a firm conviction that he has made a mistake we must reverse, *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 436 (10th Cir.1977).

In ruling on a motion to limit discovery the district judge must compare the hardship to the party against whom discovery is sought, if discovery is allowed, with the hardship to the party seeking discovery if discovery is denied. He must consider the nature of the hardship as well as its magnitude, and thus give more weight to interests that have a distinctively social value than to purely private interests. He must go through the same analysis under Rule 26(d) except that obviously an order merely postponing a particular discovery request should be granted more freely than an order denying the request altogether. The hardship to the party seeking discovery is less if he is just being told to complete his other discovery first (or just to let the other party have some discovery first) than if he is being told to do without forever.

In an effort to show that more than purely private interests are at stake, the Academy argues that its correspondence and other documents relating to denials of applications for membership are protected by the First Amendment. This argument, if meant to establish a complete immunity from discovery of these materials in a lawsuit, is untenable. See, e.g., *Memorial Hospital for McHenry Cty. v. Shadur,* 664 F.2d 1058, 1063 (7th Cir.1981) (per curiam), rejecting a claim of privilege for a hospital's records of disciplinary proceedings against staff physicians. Even if the Academy were engaged in advocating controversial views and the publication of its internal files would expose members to retaliation for those views, it would not have an absolute privilege against discovery, though the plaintiffs would then have the burden of showing that the information sought was essential to their case and unobtainable by other means that would be less likely to discourage such advocacy. See *Hastings v. North East Independent School Dist., supra,* 615 F.2d at 632; *In re Petroleum Prods. Antitrust Litigation,* 680 F.2d 5, 7 (2d Cir. 1982); *Gray v. Board of Educ. of City of N.Y.,* 692 F.2d 901, 903–05 (2d Cir.1982).

Yet there is in this case, if not a First Amendment right, at least a First Amendment interest—maybe two First Amendment interests—which the discovery sought by the plaintiffs would impair and which differentiates this from the usual antitrust case, where discovery is sought of invoices or salesmen's reports or the minutes of a corporation's board of directors. The Academy is a forum for exchanges of information about surgical techniques and related matters of substantial public interest. These exchanges may be inhibited if the Academy has to disclose its membership files. The protective order that the district judge entered is not a complete answer, not only because it is the kind of lawyers' arrangement that laymen instinctively distrust but also because the particular order allows the plaintiffs themselves, and not just their counsel—allows, in other words, two disappointed applicants for memberships—to get hold of their files. If the Academy complies with the discovery order its members may be reluctant to offer candid evaluations of applicants in the future, and the atmosphere of mutual confidence that encourages a free exchange of ideas will be eroded. Cf. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), where in a case involving resistance to disclosure of membership information in discovery proceedings the Supreme Court recognized a First Amendment right of association for the purpose of expression and advocacy of ideas. And setting aside constitutional considerations, one should not have to raise the ghosts of Aristotle and de Tocqueville to be reminded that voluntary associations are important to many people, Americans in particular, that voluntary professional associations are important to American professionals (a proposition that is the premise of the plaintiffs' antitrust suit as it was of their Illinois suit), that confidentiality of deliberations on membership applications is essential to the voluntary character of an association, and therefore that the involuntary disclosure of the membership files of a voluntary association may harm worthy private interests.

Although disclosure of the files sought by the plaintiffs would thus be costly, nondisclosure might make it impossible for them to prove their antitrust case or even to discover whether they have a meritorious case. Since the interest in the confidentiality of an association's membership deliberations is not absolute, the balance of hardships may therefore seem even. But Rule 26(d) of the Federal Rules of Civil Procedure (control of the sequence and timing of discovery) provides a method of accommodating the competing interests with minimal damage to either. If there is other discovery that the plaintiffs must complete in order to be able to resist a motion by the defendant for summary judgment, and thus a significant chance that the plaintiffs' case will fail regardless of what the internal files that they are seeking may show, the district judge should use his power under Rule 26(d) to require the plaintiffs to complete the other, nonsensitive discovery first.

His power to do so cannot be questioned. See 8 Wright & Miller, Federal Practice and Procedure §§ 2040, 2047 (1976). Nor, we think, his duty, in an appropriate case. As the First Circuit stated recently in dealing with the related question of discovery of newsmen's confidential sources, "As a threshold matter, the court should be satisfied that a claim is not frivolous, a pretense for using discovery powers in a fishing expedition. In this case, *plaintiff should show that it can establish jury issues on the essential elements of its case not the subject of the contested discovery.*" *Bruno & Stillman Co. v. Globe Newspaper Co.*, 633 F.2d 583, 597, 224 Ct.Cl. 583, 597 (1st Cir.1980) (emphasis added).

 Discovery of sensitive documents is sometimes sought not in a sincere effort to gather evidence for use in a lawsuit but in an effort to coerce the adverse party, regardless of the merits of the suit, to settle it in order not to have to disclose sensitive materials. The use of the liberal discovery provisions of the Federal Rules of Civil Procedure to harass opponents is common, and requires the vigilance of the district judges to prevent. The power granted by Rule 26(d) to control the sequence and timing of discovery is one of the district courts' too little used tools for preventing the predatory abuse of discovery and we are at a loss to understand why the power was not used here. "[J]udges should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979).

 Of course, if the plaintiffs did not need anything beyond the contents of the Academy's membership files to prove their case, there would be no other essential discovery they could be asked to do before getting access to the Academy's files. But it does not appear that the plaintiffs are attempting to prove a per se antitrust offense that would be complete if the Academy's files showed that the Academy had an anticompetitive motive in denying their applications for membership. The denial was a collective refusal by the Academy's members to deal with the plaintiffs on the identical terms on which they deal with each other, and hence a boycott. Although it used often to be said that boycotts were illegal per se, that was never entirely true. The best known statement of the Rule of Reason is found in a boycott case, *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), which involved the legality of an internal rule of a commodities exchange designed to limit competition from some of its members, a rule whose violation would have been punishable by expulsion. In any event, it is clear today that boycotts are illegal per se only if used to enforce agreements that are themselves illegal per se— for example, price-fixing agreements. See *United States Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781, 787–90 (7th Cir.1981) (en banc), for the general principle, and *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1234–36 (7th Cir.1982), cert. granted, —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983), for the price-fixing exception. At least that is the rule for organized associations having some lawful purposes; we need not decide whether a conspiracy or other ad hoc "association," if anticompetitive in intent, would be treated under a harsher standard.

 True, some cases such as *United States v. Terminal Railroad Ass'n of St. Louis*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), hold or imply that a boycott that totally excludes a competitor from a market is, for that reason alone, illegal; and that could be viewed as a species of per se illegality. Since there has been, at least as yet, no suggestion that the American Academy of Orthopaedic Surgeons has the power to prevent anyone from practicing orthopaedic surgery, these cases are of doubtful relevance. And there is a question to what extent, with their emphasis on the welfare of competitors rather than consumers (the excluded railroad in the *Terminal Ass'n* case appears to have been complaining about its exclusion from a cartel!), they can survive the consumer-oriented view of antitrust that prevails today. See, e.g., *Reiter*

*v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979). Reviewing them recently, this court held that boycotts cannot be deemed illegal per se on the basis of their impact on competitors rather than on the consuming public, if there is no "direct effort to influence the supply of, or demand for, a competitor's product." *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Ass'n, Inc.,* 672 F.2d 1280, 1286 (7th Cir.1982). None is alleged in this case. The plaintiffs are competitors of Academy members, and membership may be valuable in competing with both member and non-member orthopaedists, but there is no contention that the Academy is interfering directly with the plaintiffs' access to suppliers or customers, as by trying to get their hospital staff privileges revoked. The alleged effect of denial of membership on the plaintiffs' ability to practice orthopaedic medicine is indirect, just as denying a trial lawyer membership in the American College of Trial Lawyers would have only an indirect effect on his ability to obtain clients. We are speaking of matters of degree of course, but an "indirect" effect, by which we mean one falling far short of complete exclusion from the market, will not support a per se attack on a boycott.

Nor do the plaintiffs allege a price-fixing conspiracy among orthopaedic surgeons, a conspiracy to which the exclusion of the plaintiffs from membership in the Academy might be ancillary. Even if, as we very much doubt, a price-fixing allegation could be teased out of the statement in the complaint that Dr. Treister is willing "to consult surgical out-patients on a high-volume basis"—"high volume" perhaps implying low price—the plaintiffs have given no indication of wanting to rest their entire case on this tenuous link to the per se doctrine. They want to go further and prove a boycott that is illegal if at all only under the Rule of Reason, and to do that they will have to prove at trial some "anticompetitive market effect" from the boycott. *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 268 (7th Cir.1981); *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346, 1352 (7th Cir.1982); *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 558 (7th Cir.1980). As in *Phil Tolkan Datsun, supra,* 672 F.2d at 1287, "we decline to accept plaintiff's apparent contention that any denial of membership by an ongoing trade association constitutes a *per se* violation .... [M]embership restrictions by trade organizations not possessed of significant economic or operational leverage are more appropriately evaluated according to the standards of the rule of reason." And, of course, what is "significant economic or operational leverage" is a matter of proof too.

Thus, to get over the hurdle of a defense motion for summary judgment at the completion of pretrial discovery the plaintiffs will have to have other evidence besides whatever delicious morsels they may find in the Academy's files on denials of membership applications. They do not have the other evidence yet, though they may get it through additional discovery. According to their counsel the vast majority of the nation's orthopaedic surgeons who have been practicing orthopaedic medicine for at least three years (one of the plaintiffs' counsel said 99 percent) are members of the Academy, and it has 10,000 members in all. The plaintiffs do not suggest that the Academy places any restrictions on its members. Even the Academy's meetings are open to nonmembers, though the plaintiffs object, frivolously as it seems to us, to having to wear nonmember badges. This does not appear to be a case where an association is making a "direct effort to influence the supply of, or demand for, a competitor's product." *Phil Tolkan Datsun, supra,* 672 F.2d at 1286.

In these circumstances, if all of the Academy's members were in the same market the consumer interest in effective competition could not be seriously harmed by the exclusion of the plaintiffs and others like them—not that such exclusion is in the cards: the plaintiffs do not argue that the Academy controls entry into the practice of orthopaedic surgery. Ten thousand is a vast number of competitors. Unless they explicitly agreed not to compete and backed

up the agreement with enforcement machinery to prevent individual members from cheating, the consumer would be assured the benefits of buying in a competitive market. And though there is a sense in which the exclusion of any competitor reduces competition, it is not the sense of competition that is relevant to antitrust law. *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663–64 (7th Cir.1982); *University Life Ins. Co. of America v. Unimarc Ltd.*, 699 F.2d 846, 853 (7th Cir.1983). The policy of competition is designed for the ultimate benefit of consumers rather than of individual competitors, and a consumer has no interest in the preservation of a fixed number of competitors greater than the number required to assure his being able to buy at the competitive price. Maybe the older, competitor-protection view would survive in a case of naked aggression resulting in the total exclusion of a competitor from the market, but that would be a per se case (if anything) and this is not.

The 10,000 members of the Academy do not, however, all compete in the same market. Assume that the market for orthopaedic surgery is local—that Dr. Marrese competes with other orthopaedists in Evansville, Dr. Treister with other orthopaedists in Chicago. The plaintiffs will still have the burden at trial of showing that in these local markets the number of orthopaedic surgeons who belong to the Academy is so few that competition among them—competition that the Academy apparently does not attempt to limit or regulate—cannot be relied on to give the consuming public the benefits of competition. Unless they can show this they will be unable to ask the trier of fact to draw an inference that either the exclusion of an individual orthopaedist from a local market or the possible effect of that exclusion on the competitive behavior of other aspirants to membership could result in a higher price or lower quality of orthopaedic surgery in these communities.

The plaintiffs have made no effort yet in discovery to show a probable anticompetitive effect along the foregoing lines or any others, nor have they yet laid an adequate predicate for a per se theory of liability. We emphatically do not decide that they will not be able to make the required showing; since discovery is not yet complete, all statements of fact in this opinion are tentative. But at this early stage of the case, where virtually the only facts of record bearing on competitive effect are that the Academy has thousands of members, does not regulate their behavior, and does not control entry, the plaintiffs cannot be said to have made the required showing. The district court should not in these circumstances have ordered discovery of the Academy's membership files before there was any discovery on the issue of competitive effect. It was not enough for the court to observe that "nothing in the Federal Rules of Civil Procedure or the case law requires the imposition of such a bifurcation [of discovery] on plaintiffs." As we have pointed out, a district court has the power under Rules 26(c) and (d) of the Federal Rules of Civil Procedure, and in a clear case the duty, to defer a burdensome discovery request pending completion of discovery on an issue that may dispose of the entire case and thereby make the request moot. We are speaking here only of postponement, and not of denial, of discovery. There would have been no hardship to the plaintiffs in requiring them to conduct their discovery on competitive effect before getting into the Academy's membership files. The sequence of discovery may well have been intended to coerce the Academy to settle but in any event the balance of hardships is clear enough to make us conclude that in refusing to postpone discovery of the membership files the able district judge committed clear error.

The judgment of criminal contempt is therefore reversed. Although the Academy also asks us to order the complaint dismissed on grounds of res judicata, the district judge's denial of the Academy's motion to dismiss was an interlocutory order appealable only under 28 U.S.C. § 1292(b), which requires the district judge to certify in writing that he is "of the opinion that [the order] involves a controlling question of law as to which there is substantial ground for difference of opinion and that

an immediate appeal from the order may materially advance the ultimate termination of the litigation .... " Rightly or wrongly, the judge refused to make the certification, and we therefore have no jurisdiction to review his interlocutory order. *In re Watkins,* 271 F.2d 771 (5th Cir.1959).

REVERSED.

STEWART, Justice (Retired), dissenting.

Much that is said in the opinion of the Court strikes me as correct. Specifically, I agree that a district court has the power, and sometimes the duty, under Rules 26(c) and (d) of the Federal Rules of Civil Procedure, to defer a burdensome discovery request pending completion of discovery on an issue that may dispose of the entire case. But for reasons stated in my dissent from the Court's original opinion, see 692 F.2d, at 1097–1098, I cannot agree with the Court's ultimate conclusion that the District Court's refusal to postpone discovery of the Academy's application files in this case was "clear error."

At the heart of the controversy before us is the conflict between the Academy's legitimate concern for preserving the confidentiality of its records, and the appellants' need for evidence with which to prove their antitrust claim. The Academy's interest, however characterized, in preserving the secrecy of its deliberations is substantial. If those charged with determining the qualifications of applicants to membership in a professional organization cannot be assured that their evaluations will remain confidential, they may be less than candid in their assessments, and the organization's legitimate interest in limiting its membership to qualified persons may be impaired.

The District Court was fully cognizant of these concerns. In its order denying the Academy's request to delay discovery of its files, the District Court explicitly acknowledged that public disclosure of the contents of the application files would have a "chilling effect" on the Academy's future deliberations. But the District Court also determined that the sought-after materials were critically important to appellees' case and therefore declined to "bifurcate" the proceedings. Instead, the District Court imposed a protective order strictly limiting appellees' access to the application materials, finding that "[u]nder those restrictive conditions, the confidentiality of the Academy's admission process is largely preserved."

As the Court acknowledges, a district judge must have substantial discretion in controlling how cases proceed in the district court. That discretion is particularly broad with respect to discovery. See *e.g., Voegeli v. Lewis,* 568 F.2d 89, 96 (8th Cir.1977). If the authority of the district courts to dispose of discovery matters is to be preserved, an appellate court may not interpose its judgment on such matters unless the lower court's decision leaves it with the firm conviction that a mistake has been made.

In this case, the District Court carefully considered the competing interests and reasonably determined that they could best be accommodated through discovery pursuant to a restrictive protective order. Other judges could reasonably reach other conclusions, but I cannot say that the decision before us was an abuse of discretion. Accordingly, I respectfully dissent.