Dwight W. SHAFER, John L. Baltz, Gary Beitzel, David Bork, Jerry Dybul, Bobby G. Dyson, William C. Ebert, Nancy B. Finch, Patrick Gedig, Michael Green, James W. Hammill, David Hassa, Darwin E. Huettl, Richard A. Klemm, Sr., Donald L. Larson, William D. Larson, Daniel D. Lawrey, Frank J. Lyss, Mark A. MacDonald, Patricia A. Malek, Byron McCrary, James Sabel, Kay E. Saugstad, Jerome Schmechel, Estate of John Sternemann, by Dorothy Sternemann, its Personal Representative, Ralph C. Uzzle, Richard P. Wara, Paull Weiss, Richard F. Wilcoxon, David Williams, Robert Witthuhn, and James G. Zorn, Plaintiffs,

v.

BULK PETROLEUM CORPORATION, a Delaware corporation, and Gulf Oil Corporation, a Pennsylvania corporation, Defendants.

Civ. A. No. 79–C–153.

United States District Court,
E.D. Wisconsin.

Aug. 15, 1983.

Susan Steingass, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiffs; James A. Hauer, Elm Grove, Wis., of counsel.

Robert DuPuy, Foley & Lardner, Milwaukee, Wis., for defendants.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

This is an antitrust action brought by 32 individual plaintiffs against Gulf Oil Corporation and its wholly owned subsidiary, Bulk Petroleum Corporation. Plaintiffs allege that the defendants engaged in maximum resale price maintenance; illegally tied the sales of gasoline, milk, cigarettes, and related products to gasoline station leases; required plaintiffs to deal exclusively in Bulk's gasoline, milk, cigarettes, and other products; and conspired to fix the wholesale price of gasoline sold by Bulk to the plaintiffs. The allegations are made under both state and federal antitrust laws; on the federal claims, plaintiffs seek damages of $9 to $12 million trebled; on a state claim, plaintiffs seek more than $100 million. Defendants have moved for summary judgment dismissing all claims.

The 32 plaintiffs are independent businessmen selling gasoline in the Milwaukee and Fox River Valley areas of Wisconsin. Each plaintiff operated under a lease agreement with Bulk, which in turn delivered gasoline to them through its "Transport" Division. In the early 1970's, the agreements between the plaintiffs and Bulk were

oral. However, all of the agreements have subsequently been reduced to writing.

The agreements in question consist of several documents: a basic lease; an automotive gasoline agreement; a security deposit agreement; and a credit card agreement. The gasoline stations which the plaintiffs operated were discount, cut-rate, non-major/unbranded gasoline retail outlets. The emphasis was on pumping gas, and with minor exceptions, the stations did not provide repair facilities or other service to customers. Plaintiffs emphasize that their arrangement with Bulk did not require them to invest significant capital as a condition to entry into the business; in addition, because their main business was to pump gas, there was no substantial inventory to purchase in order to start the business.

Gulf Oil Corporation is a large refiner and supplier of petroleum products in the United States. The company does business in all sections of the country. At one time, Gulf sold gasoline in Wisconsin under the brand name "Gulf". It has not done so for over ten years.

Bulk is a wholly owned subsidiary of Gulf. It does business in Wisconsin through its "Transport" Division, which primarily is in the business of the purchase and resale of gasoline to cut-rate, non-major/unbranded outlets.

The defendants have moved for summary judgment. Their argument in support of their motion is contained in three volumes of briefs, and in numerous documents attached thereto. The three volumes of briefs are spread over a total of 165 pages. The plaintiffs' brief in opposition to the motion is 116 pages long. It is met by the defendants' 61 page reply brief. Despite their length, the briefs submitted by counsel for each side are excellent.[1]

To summarize, the defendants argue that the rule of reason, rather than the per se standard, should be applied to all of the antitrust claims at issue here, including the resale price maintenance claim. Defendants argue that the tying claims are without merit because the items involved constituted a package, rather than separate products capable of being tied; because Bulk lacks sufficient economic power in the lease market to impose an unlawful tie; because competition has not been appreciably restrained in the markets for the tied products; and because various dealers have acknowledged that they were not coerced into purchasing the tied products. Furthermore, defendants argue that plaintiffs' exclusive dealing claims are without merit. These arguments are addressed in Volume I of the defendants' brief. Volume II sets forth defendants' arguments that the intra-enterprise conspiracy claim should be dismissed because the relationship between Bulk and Gulf establishes that the two are not separate actors capable of conspiring. Defendants propose that should the claim survive the motion, it should be tested under the rule of reason. Volume III sets forth the argument that the dealers who have released their claims must be dismissed from the case. Defendants argue that the state antitrust claims must be dismissed, in that Wisconsin antitrust law does not apply to transactions involving interstate commerce. Finally, the argument is made that § 133.14, Wis.Stats., is unconstitutional.

In their response, plaintiffs concede defendants' arguments as to two claims: they concede that the tying claims brought under § 3 of the Clayton Act should be dismissed, but they argue that dismissal of the Sherman Act tying claims would not be appropriate; plaintiffs concede that the exclusive dealing claims must be dismissed.

*Rule of Reason or Per Se Standard*

Defendants seek a ruling that the rule of reason, rather than the per se standard,

---

1. The briefs in this case, though of excellent quality, are a bit long, totaling 342 pages. Counsel for both sides, who are frequent litigators in this court, should be aware of the passage of new local rules by the judges of this district on May 24, 1983. One of the new rules, number 6.01, provides that except with permission of the court, principal briefs on motions may not exceed 30 pages in length. Reply briefs are limited to 15 pages. The new rules will become effective on September 1, 1983.

should be applied to the resale price maintenance claims and the tying claims. Defendants state:

"Current judicial analysis of tying claims and resale price maintenance is generally conducted under the per se standard. However, defendants believe that the law has evolved to the point that this court should recognize that the rule of reason is appropriate for judging plaintiffs' antitrust claims in this case." Vol. 1, p. 8.

The evolution of the "law" which leads them to this conclusion is (1) their reading of *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), in which the court concluded that economic considerations should control in cases of vertical territorial and customer restraints; (2) the position announced by William F. Baxter, Assistant Attorney General and Chief of the Antitrust Division of the Department of Justice[2] in which he concluded that resale price maintenance and tying should be subject to the rule of reason; and (3) various academic articles, most notably those authored by Judge (then Professor) Richard Posner[3].

It goes without saying that while there may be some merit to the opinions of Assistant Attorneys General, their opinions are not law. The same is true of analyses performed by academics. As to the effect of *Sylvania, supra,* sitting as a district judge, I would be reluctant to extend that case to vertical price restraints or to tying claims. The court states, at n. 18, p. 51, 97 S.Ct. at n. 18, p. 2558:

"... We are concerned here only with non-price vertical restrictions. The per se illegality of price restrictions has been established firmly for many years and involves significantly different questions of analysis and policy.... Furthermore, Congress recently has expressed its ap-

proval of a per se analysis of vertical price restrictions...."

Recently, in *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the court held that horizontally imposed maximum fee agreements were unlawful per se. In that case, the district court, in reliance on *Sylvania,* had noted a "recent antitrust trend ... emerging where the Rule of Reason is the preferred method of determining whether a particular practice is in violation of the antitrust law." The Supreme Court, however, reversed and adhered to the per se rule, stating:

"We have not wavered in our enforcement of the per se rule against price fixing." At 2475.

Defendants attempt to distinguish *Maricopa County* because horizontal restraints were involved there and vertical restraints are attacked here. They quote the following passage:

"Our decisions foreclose the argument that the agreements at issue escape per se condemnation because they are horizontal and fix maximum prices. *Kiefer-Stewart* and *Albrecht* place horizontal agreements to fix maximum prices on the same legal—even if not economic—footing as agreements to fix minimum or uniform prices."

Defendants also quote the footnote which accompanies this passage:

"It is true that in *Kiefer-Stewart,* as in *Albrecht,* the agreement involved a vertical arrangement in which maximum resale prices were fixed. But the case also involved an agreement among competitors to impose the resale price restraint. In any event, horizontal restraints are generally less defensible than vertical restraints." At 2475.

---

2. For an interesting, and critical, review of Mr. Baxter's position, see the article written by David D. Stewart, an attorney in the Washington, D.C. firm of Miller, Cassidy, Larroca & Lewin. Mr. Stewart's article appears in the July 18, 1983 issue of the National Law Journal.

3. The articles were written by Judge Posner when he was a professor of law at the University of Chicago Law School. Ironically, Mr. Baxter was also a professor of law (at Stanford) before he joined the Department of Justice in 1981.

From these passages, defendants argue that the court is using *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) and *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), as a basis for holding horizontal maximum price fixing per se illegal, but at the same time stating that vertical restraints may be judged by a rule of reason.

■ Clever. *Kiefer-Stewart* and *Albrecht* involved vertical restraints on maximum prices. In *Maricopa County,* the court extended those cases to horizontal restraints and said in fact that horizontal restraints are less defensible than vertical restraints. The most obvious way to read *Maricopa County* is as follows: vertical restraints are per se illegal; horizontal restraints are less defensible than vertical restraints; horizontal restraints are therefore also per se illegal. Defendants, however, have their own reading: vertical restraints—though previously held to be per se illegal—are not as bad as horizontal restraints, so therefore they must be subject to the rule of reason. I disagree.

As to tying claims, the court in footnote 15 on page 2473 in *Maricopa County* stated:

"Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements."

■ Defendants' request to apply the rule of reason to these claims is denied. My role is to apply the law as it seems to be, not as commentators think it should be. Judge Eschbach of this circuit has recently made an eloquent statement regarding the roles of the lower courts in relation to pronouncements from the Supreme Court. In *Vail v. Board of Education,* 706 F.2d 1435 (7th Cir.1983), Judge Eschbach was writing to respond to what he called a "strongly worded dissenting opinion", ironically written by Judge Posner, whose views, while a professor of law, I am aggressively urged to adopt here [4]. Writing in regard to property

**4.** It is certainly possible that someday in the future the defendants here will be in Chicago renewing their argument on this point before a panel of the Court of Appeals for the Seventh Circuit. It is also possible that Judge Posner could be one of the members of the panel. If he is, one could hardly blame the defendants if they smile.

Judge Posner has been a member of the Court of Appeals since December of 1981. While I have found his judicial writings to be interesting and informative—he is obviously very intelligent and his style is to be admired—he has been criticized, most notably by a former brother from academia (Professor James F. Ponsoldt, University of Georgia Law School), for not remembering that he is no longer speaking as a law professor from the University of Chicago. The criticism, written as a letter to the editor and published in the February 7, 1983 edition of the National Law Journal stated:

"Since President Reagan has demonstrated no reluctance to appoint law professors to the federal judiciary, it may be appropriate to take another look at the proper role of the Senate in reviewing and approving these most important presidential appointments. In particular, the question arises: to what extent should a person's public expression of and commitment toward an ideology hostile to prevailing law and public policy effectively preclude him from serving as a judge?

"Part of the job of a law professor is to criticize and seek change. In fact, law professors often achieve prominence through their association with innovative reform and more radical schools of thought. Yet the role of a federal judge is institutionally different, if for no other reason than to engender respect for the rule of law—distinguishing our governmental system from others—among the public.

"Perhaps most startling among this group of professor-judges is Richard A. Posner, formerly a prolific University of Chicago law professor. As one example, Judge Posner's recent opinion for the 7th U.S. Circuit Court of Appeals in *Marrese v. American Academy of Orthopaedic Surgeons,* 692 F.2d 1083, reported in your Dec. 13 issue, may demonstrate the continuing need for the Senate to insist upon closer substantive scrutiny of judicial appointees' intentions.

"Judge Posner's writing and consulting had long been known for its revisionist, anti-populist critique of the existing body of antitrust legislation and Supreme Court caselaw. Judge Posner's antitrust casebook had set forth and criticized 50 years of Supreme Court antitrust boycott law as being too restrictive to business integration and not promoting economic efficiency.

"Perhaps, therefore, it should have come as no surprise that Judge Posner's opinion in *Marrese* relied on his own views and ignored at least six relevant landmark Supreme Court decisions, constituting the 50-year develop-

interests in employment, Judge Eschbach stated that a certain case was correctly decided. He explained:

"When I say 'correctly' decided, I mean that it was decided in accordance with the authoritative pronouncements of the United States Supreme Court and remains good law in light of subsequent precedent. Whether it was correctly decided in some sort of ultimate jurisprudential or philosophical sense is not within my domain as an intermediate appellate court judge once I have decided that it was properly decided in the former sense. My brother Posner calls this approach to deciding cases 'putting the blame on the [Supreme] Court.' ... I call it adherence to *stare decisis* and to a superior authority."

It would be inappropriate for me to adopt what is essentially a new standard for judging price fixing and tying claims. In their motion, however, defendants request that I go even further than that and grant summary judgment. Summary judgment is, of course, proper in antitrust cases if no material facts are in dispute. See *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163 (7th Cir.1978), *cert. den.* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). Although it is true that no greater caution is required in judging a summary judgment motion in antitrust litigation than in any other litigation (see *Weit v. Continental Ill. Nat. Bank & Trust Co.,* 641 F.2d 457 (7th Cir.1981), *cert. den.* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982)), that is not to say that caution should be thrown to the wind.

### Tying

Defendants argue alternatively that even if the per se rule is applied, summary judg-

ment should be granted dismissing the tying claims. Defendants claim that what is involved here were packaged distribution systems, rather than separate products capable of being tied. In addition, they argue that Bulk lacked sufficient economic power in the lease market to impose an unlawful tie; that competition has not been appreciably restrained; and that certain plaintiffs have admitted that they were not coerced into purchasing the tied products.

■ I am unpersuaded that summary judgment is appropriate on the tying claim under § 1 of the Sherman Act (the Clayton Act claim is dismissed per plaintiffs concession that it ought to be). At this point I am unconvinced by the contention that the dealerships involved in this action constitute packaged distribution systems. Since May, 1980, defendants have leased stations to certain of the plaintiffs on terms that did not require them to buy gasoline or any other products from the defendants. That action by the defendants raises a significant issue of fact as to whether what is involved here is a package.

Additionally, defendants attempt to slide this case into the category of franchise cases. A genuine issue of material fact exists as to whether that is the proper category. What is involved here is a lease of a gasoline station for unbranded discount gasoline. No business distribution system has been established, nor is any business reputation at issue.

Similar issues of fact preclude findings regarding defendants' economic power to impose an illegal tie. In *Fortner I* and *Fortner II*[5], the Supreme Court analyzed

---

ment of the law through the present day. What is surprising, as evidenced by retired Justice Potter Stewart's outraged dissent in *Marrese* (Justice Stewart was sitting on the panel by designation), is that Judge Posner purported to revise the law and legislative history in a private antitrust case in which the merits of the antitrust claim had never been submitted to trial or even to pretrial discovery. The case was an interlocutory appeal in which the appellate court admittedly lacked jurisdiction to reach the merits of

the antitrust claim and in which Judge Posner did not even participate in oral argument. "The Posner opinion in *Marrese* represents the imperial judiciary in its extreme. The possibility of similar judicial nullification, based upon any ideology, should be addressed specifically by the Senate in its confirmation hearings, at least where the nominee is so publicly associated with an extralegal view of public policy."

5. *Fortner Enterprises v. U.S. Steel,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *U.S.*

the factors which may indicate requisite economic power: (1) the seller occupies a dominant position in the tying market; (2) the seller's product is sufficiently unique that it provides him with an advantage not shared by the competitors; or (3) a substantial number of customers have accepted the tie and there are no explanations other than the seller's economic power for their willingness to do so. In the case before me, plaintiffs agreed to purchase all their gasoline from Bulk for the duration of the leases. They continued to buy from Bulk even when Bulk admittedly charged excessive prices. A genuine issue of material fact exists as to whether an explanation exists for this behavior, other than defendants' economic power.

Defendants also argue that no tying claim can be established because competition has not been appreciably restrained, in that Bulk's shares in the relevant market are slight. Summary judgment on this issue is also inappropriate. The requirement that a "not insubstantial" amount of commerce be affected by the tie is not necessarily dependent on market shares:

"An analysis of market shares might become relevant if it were alleged that an apparently small dollar-volume of business actually represented a substantial part of the sales for which competitors were bidding. But normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be *de minimis*, is foreclosed to competitors by the tie...." *Fortner I*, 394 U.S. 495, 501, 89 S.Ct. at 1257–58.

Additionally, plaintiffs have raised an issue of fact on this point.

Finally, defendants argue that the tying claims must be dismissed because of a lack of coercion in the arrangement between them and certain of the plaintiffs. This argument must also be rejected. Even if the facts show that a few plaintiffs did not feel direct coercion, the claim need not necessarily fail. See *Tire Sales Corp. v. Cities Service Oil Co.,* 637 F.2d 467 (7th Cir.1980),

*Steel Corp. v. Fortner Enterprises,* 429 U.S.

*cert. denied* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981). In summary, issues of material fact preclude summary judgment on the tying claims.

### Resale Price Maintenance

Defendants argue that summary judgment must be granted as to the resale price maintenance claims because defendants' actions regarding prices is condoned in *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). This argument also must be rejected.

As interpreted by later decisions, *Colgate* held that a seller's advance announcement that it will not sell to price cutters and its termination of customers who cut prices, without more, is not a Sherman Act violation. However, an illegal combination is found if

"... the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." *United States v. Parke, Davis & Co.,* 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960).

Plaintiffs have raised issues of fact regarding whether defendants here have used such means to secure adherence to their pricing policies.

### Intraenterprise Conspiracy

Defendants claim that the intraenterprise conspiracy claim should be dismissed because plaintiffs cannot establish a separateness of identity between Gulf and Bulk, an element necessary to allow them to conspire.

The intraenterprise conspiracy doctrine has been roundly criticized by commentators (see *Independence Tube Corp. v. Copperweld Corp.,* 691 F.2d 310, 317 n. 3 (7th Cir.1982). Be that as it may, the Supreme Court has made sweeping pronouncements supporting the theory, and those pronouncements cannot be disregarded:

610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977).

"For a federal judge at the trial or appellate level, the salient factor is that the Supreme Court's decisions, while they need not be read with complete literalism, of course they cannot be ignored." *Independence Tube,* at 317.

In *Timken Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951), for example, the court stated:

"The fact that there is common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws."

In *Perma Mufflers v. Int'l Parts Corp.,* 392 U.S. 134, 141–2, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968), the court stated:

"... [S]ince respondents Midas and International availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities."

In deciding this issue, the Court of Appeals for this circuit has focused "on the practical relationship between the parent and the subsidiary, using a variety of factors to decide when there is enough separation between the two entities to make treating them as two independent actors sensible." The focus essentially is on the question as to "when the distinction between affiliation and integration is trivial and when it is significant." *Independence Tube,* at 318.

The factors involved in the analysis were first articulated in *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704 (7th Cir.1979), *cert. denied* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), and include the following: the extent of integration and ownership, whether the two corporations have separate managerial staffs, whether efficiencies would be notably sacrificed if they acted as two firms, whether the firms functioned separately before being partially integrated, the extent to which they can wield market power when they act as one corporation—power they would not have as separate corporations. The analysis is in a

formative stage; the factors are not "canonical". *Independence Tube,* at 318.

▮ What they are, however, is highly dependent on the facts of a particular case, making, at this stage in the development of the law, a grant of summary judgment on this issue rather risky. In the case before me defendants list numerous factors which they consider relevant to the issue, and which in their view establish that plaintiffs will not be able to show two entities capable of conspiring. Plaintiffs, quite expectedly, counter with factors of their own which present issues of material fact. To make a judgment on this issue requires a weighing of facts and evidence, an undertaking that cannot be correctly negotiated on a motion for summary judgment.

### Releases

Defendants argue that summary judgment should be granted against the eight dealers who have signed releases of claims and causes of action. Defendants contend that federal law, rather than Wisconsin law, governs the interpretation of the releases. According to the defendants, under federal law, the claims of these plaintiffs would be barred. Alternatively, defendants argue that even under Wisconsin law, the claims are barred.

Plaintiffs argue that Wisconsin law governs the interpretation of the releases, which are in fact contracts; that under Wisconsin law, the claims would not be barred by the releases; and that even if federal law is applied, factual disputes preclude summary judgment. Finally, plaintiffs argue that the releases are with Bulk and that, therefore, the claims against Gulf can proceed.

Although *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), stated that there was "no federal general common law", a body of federal common law has grown over the years in limited areas where a federal voice is necessary. The areas are "few and restricted" (*Wheeldin v. Wheeler,* 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963)), and are limited to situations in which federal law is neces-

sary to protect a federal interest or in which Congress has given the court the power to develop substantive law. *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981).

The most comprehensive discussion to which I have been referred on this issue is *Three Rivers Motors Company v. Ford Motor Company,* 522 F.2d 885 (3d Cir.1975), cited by both sides as support for their respective positions. As defendants point out, the court indicated that it was competent to interpret releases without reference to state law. However, as plaintiffs emphasize, the court then went on to state that it was "also free to apply a state rule of law." It stated that it had to determine whether the policies embodied in the antitrust laws would be better served by the absorption of state laws regarding releases or by the formulation of a federal rule. Factors relevant to a decision were (1) the need for a federal rule, (2) the extent to which the transaction in question first falls within the normal course of activities regularly governed by state law, and (3) the possibility of a state rule frustrating the federal statutory scheme. The court concluded that state law was appropriate to the interpretation of leases.

■ I agree. The action before me was brought under the federal antitrust laws. The releases, which are contracts between the dealers and Bulk, are defenses to the antitrust action. There would be nothing particularly unusual for federal law to be applied to one issue and state law to the other. In fact, the parties in entering into the releases—if they gave it any thought whatsoever—would probably have assumed that Wisconsin law would govern them.

More important here, the application of Wisconsin law in this case will not frustrate the federal statutory scheme. That scheme would be frustrated if a state had a rule on releases which would preclude a plaintiff from pursuing a federal claim in a situation in which federal common law would allow him to proceed. That is not the case here. According to both sides in this litigation, the releases will receive very vigorous scrutiny under Wisconsin law. In fact, it is possible that if federal law were applied in this case, the plaintiffs might be precluded from bringing their antitrust actions in federal court but be allowed to proceed on a claim in state court.

Additionally, it is somewhat unclear what "federal common law" exists in this circuit on the interpretation of releases. Two cases are cited: *Fabert Motors, Inc. v. Ford Motor Company,* 355 F.2d 888 (7th Cir. 1966), *cert. den.* 384 U.S. 939, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966) and *Richard's Lumber & Supply v. U.S. Gypsum Co.,* 545 F.2d 18 (7th Cir.1976), *cert. den.* 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 593 (1977). It may be that federal common law is being applied in those cases although there is no explicit discussion of the appropriate rule of law. Neither decision attempts to set forth a comprehensive federal rule regarding releases. And in fact, *Richard's Lumber* cites *Three Rivers, supra,* in which state law was applied.

■ Under Wisconsin law, the validity of a release is a question of fact. Also under Wisconsin law on this record, summary judgment is inappropriate.

*State Law Claims*

■ Defendants argue that this court lacks jurisdiction over the plaintiffs claims brought under the state antitrust statutes. The argument is without merit. The motion for summary judgment on this issue is denied.

Finally, defendants argue that any recovery pursuant to a claim based on § 133.14, Wis.Stats., must be reduced to reflect the benefits plaintiffs have received under the allegedly illegal contracts. If no set off is made, defendants argue, the statute is unconstitutional.

Section 133.14 provides:
"All contracts or agreements made by any person while a member of any combination or conspiracy prohibited by section 133.03, and which contract or agreement is founded upon, is the result of, grows

out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person. Any payment made upon, under or pursuant to such contract or agreement to or for the benefit of any person may be recovered from any person who received or benefitted from such payment in an action by the party making any such payment or the heirs, personal representative or assigns of the party."

The language of the statute shows that no set off is contemplated. In *Madison v. Hyland, Hall & Co.*, 73 Wis.2d 364, 243 N.W.2d 422 (1976), the Wisconsin Supreme Court compared the statute to the setting aside of an illegal or fraudulent contract, in which case the defrauded party is entitled to recoupment of the full contract price without a requirement for set off.

Defendants argue that if no set off is made, the statute as applied in this action is unconstitutional. The recovery plaintiffs seek under the statute is $100,000,000; whereas their actual damages are said to be $4,000,000. Defendants claim that the difference between the two amounts is an unconstitutional taking in violation of the due process clause.

Penalty provisions may be unconstitutional

"... when in their actual operation in the cases before it, such statutes work an arbitrary, unequal and oppressive result.... which shocks the sense of fairness the Fourteenth Amendment was intended to satisfy in respect to state legislation...." *Chicago & Northwestern Railway Co. v. Nye-Schneider-Fowler Co.*, 260 U.S. 35, 44-45, 43 S.Ct. 55, 59, 67 L.Ed. 115 (1922).

According to the defendants, in evaluating the constitutionality of penalty provisions, courts look to three factors: the size of the penalty; the proportion of the penalty to actual damages; and the relationship between the penalty, the violation, and the public interest sought to be protected.

To state the criteria reveals, I think, the premature nature of defendants' request for summary judgment on this issue. There has been no finding of actual damages. The nature of the violation has not been judged. While it is true that a claim for $100,000,000 sounds a little ridiculous, dealing as we are here with a mine run antitrust claim affecting cut-rate gasoline operations and not the property damage claims that followed the eruption of Mt. St. Helens, it could become clear at trial that the size of the claim is due to the volume of business conducted under illegal contracts. If so, plaintiffs should not be thrown out of court because they were harmed excessively, rather than moderately. The motion in regard to § 133.14, Wis.Stats., is denied at this time.

I am aware that other minor issues, such as the standing of plaintiff Zorn, have not been specifically addressed in this decision. Eleven lawyers were apparently involved in the preparation of the briefs and supporting materials for this motion. Their work as I have stated was well done. However, not every claimed deficiency in this case need be addressed at this time. If issues remain, they can be addressed at trial, for the motion for summary judgment, except as noted below, is denied.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment is DENIED, with the exception that plaintiffs' tying claims under § 3 of the Clayton Act are DISMISSED and plaintiffs' exclusive dealing claims are DISMISSED.